UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **SANIMAX USA, LLC**  )<br>  )<br>    Plaintiff,  )<br>  )<br>  vs.  )<br>  )<br> **CITY OF SOUTH ST. PAUL**,  )<br>  )<br>    Defendant.  )<br>  ) | Case No. |

## COMPLAINT

Plaintiff Sanimax USA, LLC ("Sanimax"), by its undersigned counsel and for its complaint against Defendant City of South St. Paul, Minnesota ("South St. Paul" or "City"), alleges as follows:

### NATURE OF ACTION

1. South St. Paul *really* wants Sanimax out of its city limits. Earlier this year, Sanimax was forced to file an action in this Court to save itself from an unconstitutional zoning ordinance that the City is using to drive Sanimax out of town (Case No. 0:20-cv-01210 (SRN/ECW), "the Zoning Lawsuit"). That complaint began with the same language as this one: "*South St. Paul wants Sanimax out of its city limits*," and in it, Sanimax predicted the City would use the zoning ordinance to preclude Sanimax from upgrading its odor mitigation technology but then turn around and fine the company for alleged odor violations.

2. Well, the City went ahead and did just that. Right after Sanimax filed the Zoning Lawsuit, the City enacted a retaliatory and unconstitutionally vague odor ordinance and then proceeded to issue multiple fines against Sanimax. The tally so far is four citations and $3,000 in fines, with no end in sight absent court intervention.

4844-8106-7976.3

3.     The City's actions ignore Sanimax's long history as a good corporate citizen, attempting to paint Sanimax as the villain when it is just the opposite. Sanimax has operated in the same location, conducting essentially the same business operations, for over 50 years. During that half-century, Sanimax has continuously employed local residents, invested heavily in improving its facility, complied with state and federal regulations, and made substantial efforts to cooperate with South St. Paul to address concerns about the alleged effect of Sanimax's operations on neighboring properties.

4.     Sanimax is also a major recycler, turning by-products from other agricultural and food businesses into essential ingredients and components used in a variety of industries. Not only do Sanimax's operations play a key role in the supply chain for many of the household products on which we all rely, it significantly reduces dependence on landfills.

5.     Nevertheless, Sanimax's corporate citizenship and environmental stewardship has failed to appease South St. Paul and its leadership.

6.     Sanimax operates a rendering facility at 505 Hardman Avenue South in South St. Paul. Throughout the 20th century, numerous animal stockyards and meat-packing plants operated within this area of the City. The animal stockyards in South St. Paul grew to be some of the largest anywhere in the world, and Sanimax's rendering facility was a key contributor to the thriving industry in South St. Paul.

7.     Over the course of the 1970s and 1980s, due to changes in the agricultural and food industries, many of the businesses in the area suffered and closed. Yet a number still remain, including Sanimax, which continues to operate today in much the same capacity—albeit in a modernized form—as when it started operations in the early 1960s.

8.     Due to the longstanding operation of animal stockyards and meat-processing facilities, odors have long been a concern in this area of the City. Recognizing the importance of mitigating any adverse external effects of its business, Sanimax has made substantial efforts and investments over the years in odor-mitigation technology and has attempted to work collaboratively with South St. Paul to address any odor-related issues.

9.     In 2014, purportedly concerned with odors allegedly attributed to Sanimax's operations, South St. Paul targeted Sanimax with a new nuisance ordinance. In doing so, South St. Paul designated Sanimax as a "significant odor generator," imposed new draconian regulations based on unspecified odor standards, and threatened Sanimax with severe financial penalties for any purported "noncompliance." Sanimax filed a lawsuit in this Court to prevent South St. Paul's enforcement of the new ordinance. In response, South St. Paul withdrew the "significant odor generator designation" and amended the unconstitutional ordinance to address some of the deficiencies identified by Sanimax in its lawsuit.

10.    Later, in 2017, South St. Paul tried a different plan of attack and proposed a zoning ordinance that would have reclassified Sanimax's core business operations as a "prohibited use." Sanimax challenged the proposed ordinance before its enactment, noting that it specifically targeted Sanimax and that there was no rational basis for the new restrictions. South St. Paul backed down again, ultimately withdrawing the ordinance, which seemed to end the City's quest to drive Sanimax away.

11.    But alas, in November 2019, South St. Paul introduced a new zoning ordinance nearly identical to the 2017 proposal, the only difference being tighter geographic boundaries (which targeted Sanimax even more than before). This attempt to push Sanimax out is known as City of South St. Paul Ordinance No. 1350 ("the Zoning Amendment") and, if allowed to stand,

3

would relegate Sanimax's uses of its facility to "legal nonconforming uses" (as opposed to their previous status governed by a conditional use permit). The practical effect of this zoning change would be to prevent Sanimax from making future investments in repairs or improvements to its facility (including improvements designed to mitigate odor issues) and to deprive Sanimax of the ability to expand and improve its facility in the future. Sanimax is currently challenging this ordinance in the Zoning Lawsuit.

12. As it turns out, the Zoning Amendment was merely the first step in the one-two punch the City is unleashing against Sanimax. Soon after enactment of the Zoning Amendment, and right after Sanimax filed the Zoning Lawsuit, the City enacted a "new" version of the City's odor ordinance. The word "new" is in quotes because this latest version of the odor ordinance largely reverts back to the 2014 version—the one Sanimax challenged in this Court, prompting the City to amend that unconstitutional ordinance—and the City has already issued four separate citations against Sanimax in only a couple months' time.

13. The City is not hiding its intentions with these unconstitutional ordinances. Prior to the enactment of the Zoning Amendment, one of the City's representatives said the objective is to "sunset" Sanimax as a business in South St. Paul, and the City zoning administrator has admitted the City wants to shut down Sanimax's operations, stating: "Don't you think that if we had any legal means to do that, we would?"

14. This is an action under 42 U.S.C. § 1983 for declaratory and injunctive relief to prevent enforcement of the City of South St. Paul Ordinance No. 1356 (the "2020 Odor Ordinance"), and for damages caused by the City's unlawful retaliation against Sanimax for its constitutionally protected activity.

## JURISDICTION AND VENUE

15. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

16. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17. Venue is proper in this District under 28 U.S.C. § 1391(b) because South St. Paul is located within this District and a substantial part of the events giving rise to Sanimax's claims occurred within this District.

## PARTIES

18. Sanimax is a limited liability corporation duly organized and existing under the laws of the State of Wisconsin. Sanimax maintains a business location at 505 Hardman Avenue South, South St. Paul, Minnesota.

19. The City is a Minnesota municipal corporation, duly organized under the laws of the State of Minnesota.

## BACKGROUND ALLEGATIONS

**I.   Sanimax's History in South St. Paul.**

20. Sanimax operates an animal rendering and used cooking oil processing facility at 505 Hardman Avenue South in South St. Paul. Sanimax transforms by-products from the agricultural and food industries into renewable products that are returned to the market and used in numerous household goods. Through its highly efficient processes, Sanimax recycles by-products from other businesses into essential ingredients and components used in a variety of industries, creating many everyday household products and reducing landfill use.

21. Sanimax has a long history in South St. Paul, operating continuously at its current location since the early 1960s, when Sanimax relocated its rendering facility to complement South St. Paul's booming stockyard. The area's stockyards would grow to one of the largest stockyards

5

in the world, and Sanimax's rendering facility was a key contributor to the thriving industry in South St. Paul.

22. Sanimax is located in the heart of an area previously dominated by stockyards and meat-packing plants. This area has long been a source of odor generated from meat processing and related businesses. Although some of these industries have left South St. Paul, a number remain, such as cattle hide processing and tanning companies, a beef processing plant, a recycling and energy center, a pet crematorium, and South St. Paul's own compost site.

23. Over the years, Sanimax has made significant efforts and investments in odor-mitigation and has worked collaboratively with South St. Paul to address any odor concerns.

**II.     The City Targets Sanimax with the 2014 Odor Ordinance.**

24. In July 2014, South St. Paul passed South St. Paul Ordinance No. 1279 (the "2014 Odor Ordinance"), imposing heavy regulatory burdens and administrative sanctions on property owners in the City without prescribing any objective odor-verification standards to determine whether a violation of the ordinance in fact occurred.

25. In addition to broadly prohibiting all "offensive or obnoxious" odors—without prescribing any objective odor verification standards—the 2014 Odor Ordinance permitted South St. Paul's city engineer to designate certain properties as a "significant odor generator." Any property so designated would then be subject to enhanced odor testing, need to design a comprehensive odor management plan, install any odor control technology required by the city engineer, and face the possibility of significant financial penalties through administrative citations for any "non-compliance" found by the city engineer.

26. Throughout 2015, Sanimax worked closely with South St. Paul to reduce odor emissions. These mitigation efforts included Sanimax installing a new ozone generation system, an odor misting system, and significant upgrades to its odor abatement equipment.

6

27. Sanimax's odor mitigation efforts were successful, and verified odor complaints decreased from 38 in 2013 to 6 in 2015. Overall, Sanimax's hard work resulted in two straight years of 40% reduction in Sanimax's odor profile, as documented in the City's own reports.

28. Nonetheless, in December 2016, South St. Paul designated Sanimax as a "significant odor generator" under the 2014 Odor Ordinance, placing Sanimax at risk for significant financial penalties for any future odor-related complaints or "noncompliance" found by the City.

29. In February 2017, Sanimax filed suit in this Court, challenging the 2014 Odor Ordinance as unconstitutionally vague. In response to that lawsuit, South St. Paul removed Sanimax's designation as significant odor generator and modified the 2014 Odor Ordinance to account for several of the issues identified by Sanimax in its lawsuit. Unfortunately, these modifications turned out to be temporary, as explained in more detail below.

**III.   When That Failed, the City Tried to Zone Sanimax Out of Existence.**

30. Later that year (2017), South St. Paul proposed an amendment to Section 118-129 of its zoning code that would have created a "light industrial district" covering the area where Sanimax's facility is located. The proposed ordinance listed the following as prohibited uses: "processing of grease or organics into by-products;" and "rendering, reclaiming or processing of animals or meat by-products."

31. Sanimax again challenged South St. Paul's proposed ordinance, noting that it specifically targeted Sanimax and that there was no rational basis for the new restrictions. South St. Paul ultimately withdrew the proposed zoning amendment.

32. On September 3, 2019, Sanimax representatives toured another facility in the area, located at 205 Hardman Avenue South in South St. Paul, to consider subletting a portion of the facility for use as a truck repair shop. While touring the facility, the real estate agent—who had

been retained by South St. Paul to market the facility—told Sanimax representatives that he was given specific instructions from South St. Paul officials not to sell the facility to Sanimax.

**IV.     Round 2 of the Zoning Attack Forces Sanimax to File Suit.**

33.     In October of 2019, South St. Paul renewed its effort to force Sanimax out of the City by proposing the Zoning Amendment that is the subject of the Zoning Lawsuit, South St. Paul Ordinance No. 1350. Like the amendment proposed in 2017, the Zoning Amendment creates a new "light industrial zone" covering the location of Sanimax's facility. Sanimax is the only business in the "light industrial zone" that faces serious negative impacts from the Zoning Amendment. The geographic scope of the Zoning Amendment is smaller than that proposed in 2017, encompassing Sanimax's property but not the properties of similar businesses in the immediate vicinity, including a tannery just south of Interstate 494 (the southern boundary of the "light industrial zone") and a slaughterhouse just north of Grand Avenue (the northern boundary of the "light industrial zone").

34.     In its agenda report regarding the Zoning Amendment, South St. Paul indicated that it intended to "redevelop" the area that encompasses Sanimax's facility and to "transition" away from business operations like that of Sanimax. While preemptively denying that it was targeting any specific businesses, South St. Paul referred to longstanding corporate citizens such as Sanimax as "remnant properties" that are purportedly "not consistent with the spirit, intent and policies" of South St. Paul's new zoning plans.

35.     Indeed, before the start of an October 2, 2019 meeting of South St. Paul's planning commission, a zoning administrator admitted the City wants to shut down Sanimax's operations, stating: "Don't you think that if we had any legal means to do that, we would?"

36.     Just like the 2017 proposal, the Zoning Amendment adds the following as prohibited uses: "processing of grease or organics into by-products;" and "rendering, reclaiming

8

or processing of animals or meat by-products." This is a clear attempt to proscribe core aspects of Sanimax's business. Notably, the Zoning Amendment does not list the types of things most people would think of when asked to identify "heavy industrial" uses, such as oil refineries, coal mining, metallurgy, etc. None of those uses are expressly prohibited in the "light industrial zone" created by the Zoning Amendment, in contrast to what the City is doing to Sanimax.

37. The Zoning Amendment renders Sanimax's use of its facility a legal nonconforming use.

38. Before the enactment of the Zoning Amendment, Sanimax's facilities were governed by conditional use permits that allowed Sanimax to repair, maintain, and improve its existing facility to keep up with business needs and comply with other city, state, and federal regulations.

39. Sanimax's status as a legal nonconforming use dramatically decreases the economic value of the property and negates over 50 years of investment by Sanimax in its facility and South St. Paul.

40. In spite of protests from Sanimax, South St. Paul's City Council passed the Zoning Amendment on November 18, 2019. The Zoning Amendment went into effect on November 24, 2019, and Sanimax filed suit May 18, 2020 challenging the Zoning Amendment on various grounds.

**V.    The City Again Amends Its Odor Ordinance, Unleashing a "One-Two Punch" against Sanimax of Restrictive Zoning + Alleged Odor Ordinance Violations.**

41. Having handcuffed Sanimax's ability to improve its odor mitigation technology, the City fired its kill shot of a new odor ordinance that makes it much easier for the City to arbitrarily issue odor "nuisance" violations. The City has since proceeded to levy multiple fines against Sanimax.

9

42. This was a rather stunning reversal for the City. After Sanimax's 2017 lawsuit, the City at least attempted to make its odor ordinance fair and objective, adding a requirement that a property owner would need to accrue seven verified odor complaints in a six-month period to be considered a "significant odor generator," with "verified complaints" requiring confirmation by a Nasal Ranger® Field Olfactometer. While the Nasal Ranger is far from perfect—it still relies on the vagaries of human sensitivity and cannot identify the source of a particular odor—it is at least an *attempt* to make the process more objective.

43. But the City's attempt to act in good faith was short-lived. In May 2020, right after Sanimax filed the Zoning Lawsuit, the City enacted a new version of the odor ordinance (i.e., the 2020 Odor Ordinance) that removes all objectivity.

44. The City was open regarding its motivations behind this amendment. The agenda report presented to the city council stated that the 2014 Odor Ordinance (as revised following Sanimax's 2017 lawsuit) lacked "sufficient 'teeth' to empower the City to take necessary *punitive action*." In order to give the ordinance "better 'teeth,'" the report proposed creating "a 2-track system for dealing with businesses that are generating odors in violation [of] the ordinance."

45. "Track 1" consists of keeping the existing system in place for most properties, whereby after receiving seven verified complaints—verified by the Nasal Ranger technology—the City may designate a property as a significant odor generator. This then initiates an administrative process through which the significant odor generator works collaboratively with the City to address the issue. Administrative citations and financial penalties for these properties are not immediate, but are only imposed months later if the property fails to address the issue and remains noncompliant.

46. In stark contrast, the new "Track 2" under the 2020 Odor Ordinance applies to any property that the City disfavors (properties "not interested in working with the City" in the language of the city council agenda report). Without being designated as a "significant odor generator" under the requirements of the ordinance (i.e., at least seven verified odor complaints using the Nasal Ranger), and without any objective verification whatsoever, properties placed on Track 2 receive a single "warning letter for their first odor violation" and then "receive an administrative citation with a fine for each subsequent odor violation." Such properties are subject to fines starting at $200 and doubling for each subsequent violation.

47. As with the 2014 Odor Ordinance, nothing in the 2020 Odor Ordinance even attempts to define what constitutes an "offensive or obnoxious" odor, and therefore the 2020 Odor Ordinance does not provide any objective metric that would allow someone to determine whether a violation has occurred. Instead, a "violation" of the 2020 Odor Ordinance is based solely on the city engineer's or city administrator's subjective assessment of an odor and association of that odor with Sanimax (or, even more problematically, the an unverified complaint from a resident about an odor that the city engineer or city administrative attributes to Sanimax).

48. The 2020 Odor Ordinance also provides no guidelines to the city engineer or city administrator about how to determine whether any particular property should be placed on "Track 1" (collaboration with the City) or "Track 2" (immediate punitive action by the City).

49. Put directly, and as expressly acknowledged by the City, the 2020 Odor Ordinance arbitrarily discriminates between similarly situated properties within South St. Paul. Those properties that the City favors are placed on "Track 1" and are relieved from the risk of immediate administrative citations while they collaborate with the City on an odor mitigation plan. Meanwhile, those properties the City disfavors are placed on "Track 2" and are subject to

immediate punitive action from the City in the form of administrative citations carrying increasingly significant financial penalties.

50. Sanimax filed the Zoning Lawsuit on May 19, 2020.

51. On June 17, 2020, the City sent Sanimax a warning letter, which claimed that Sanimax had been found in violation of the 2020 Odor Ordinance.

52. On July 7, 2020, the City issued its first administrative citation to Sanimax for a purported violation of the 2020 Odor Ordinance. The City followed up that administrative citation with a second issued on July 8, 2020. Since then, the City has issued two more administrative citations to Sanimax for purported violations of the 2020 Odor Ordinance. True and correct copies of the four administrative citations and accompanying letters are attached as Exhibit B.

53. In total, the fines associated with each of these four administrative citations amount to $3,000. These are the first citations the City has issued against Sanimax since Sanimax's 2017 lawsuit. Despite Sanimax having the same odor profile the entire time, the City had not issued a single fine, citation, or even a warning in the three year interim period. Yet somehow now, after Sanimax challenges the unconstitutional Zoning Amendment in the Zoning Lawsuit, the City targets Sanimax for multiple fines in the span of weeks.

54. On information and belief, no other property within South St. Paul has received an administrative citation from the City for a purported violation of the 2020 Odor Ordinance.

55. In practice, the City uses "Track 1" of the 2020 Odor Ordinance for all properties in South St. Paul, except for Sanimax, which it arbitrarily has assigned to the new "Track 2" and "punitive action" in the form of immediate administrative citations.

## COUNT I
**Violation of Procedural Due Process Under the Fourteenth Amendment of the United States Constitution – Void for Vagueness – 42 U.S.C. § 1983**

56. Sanimax incorporates each of the preceding paragraphs as if set forth fully here.

12

57. Under the Fourteenth Amendment of the United States Constitution, no person can be deprived of life, liberty, or property, without due process of law.

58. A due process violation can occur in either one of two independent scenarios: (1) where an ordinance fails to provide notice that enables ordinary people to understand what conduct is prohibited, or (2) if an ordinance's vagueness authorizes or even encourage arbitrary and discriminatory enforcement. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

59. The 2020 Odor Ordinance implicates both due process concerns and therefore violates the Procedural Due Process Clause of the Fourteenth Amendment of the United States Constitution.

60. The 2020 Odor Ordinance fails to prescribe a standard to property owners notifying them of what is required to avoid a violation. Instead, the 2020 Odor Ordinance makes creating an "offensive or obnoxious" odor unlawful, which inherently depends on the subjective vagaries of each and every one of the City's residents' subjective sense of smell. The 2020 Odor Ordinance does not even attempt to define what constitutes an "offensive or obnoxious" odor, instead leaving enforcement entirely up to the subjective perceptions of the city engineer and city administrator.

61. Moreover, the 2020 Odor Ordinance (by design) actively encourages arbitrary and discriminatory enforcement by those tasked with enforcing it. By creating a "2-track system" for enforcement, and by failing to specify any objective metrics for assigning particular properties to either track, the 2020 Odor Ordinance actively invites city officials to pick out disfavored properties and businesses (i.e., Sanimax) for "punitive action." This arbitrary and discriminatory feature of the 2020 Odor Ordinance is magnified by the fact that the 2020 Odor Ordinance lacks any objective standards for determining whether a violation has occurred in the first place. Instead, the 2020 Odor Ordinance leaves all of the important determinations to the city engineer's and city

administrator's personal determination, unchecked by any objective metrics whatsoever, thereby actively encouraging arbitrary and discriminatory enforcement.

62. The 2020 Odor Ordinance—both in failing to notify property owners regarding necessary compliance requirements and failing to provide clear enforcement guidance to the city engineer and city administrator—is therefore void for vagueness under the Fourteenth Amendment of the United States Constitution.

63. The 2020 Odor Ordinance also violates the Procedural Due Process Clause by prescribing arbitrary and discriminatory procedures for the deprivation of property rights.

64. Sanimax possesses a protected property interest at its facility located in the City, and possesses property rights to use its property as it sees fit, subject to the proper exercise of state and local police powers.

## COUNT II
### Violation of Procedural Due Process under the Fourteenth Amendment to the United States Constitution – Retaliation – 42 U.S.C. § 1983

65. Sanimax incorporates each of the preceding paragraphs as if set forth fully here.

66. Retaliation against a plaintiff's exercise of a constitutionally protected right is actionable under 42 U.S.C. § 1983 as a violation of the plaintiff's due process rights under the Fourteenth Amendment to the United States Constitution. *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001).

67. To prove retaliation, a plaintiff must show (1) that it engaged in protected activity; (2) that the defendants took adverse action in response; and (3) that its protected activity was the cause of the retaliation. *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994).

68. The First Amendment to the United States Constitution protects the right to seek redress in a court of law. *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

69. Sanimax brought legal actions to address South St. Paul ordinances that violated Sanimax's rights. As a result of Sanimax's constitutionally protected activity, South St. Paul abandoned the previously enacted 2014 Odor Ordinance and a proposed zoning ordinance similar to the Zoning Amendment at issue in the Zoning Lawsuit.

70. South St. Paul then enacted the Zoning Amendment and the 2020 Odor Ordinance, which it is using to target Sanimax's business, as retaliation against Sanimax for its previous constitutionally protected activity.

71. Sanimax's protected activity challenging the actions of the City was the direct and proximate cause of City's ensuing administrative citations against Sanimax.

72. South St. Paul officials have openly stated a desire to use "any legal means" to eliminate the Sanimax facility. The exact words were: "*Don't you think that if we had any legal means to do that, we wouldn't have already?*" *See* ¶ 36, *supra*. This comment plainly referred to attempts to push Sanimax out of South St. Paul. Sanimax anticipates further discovery will reveal similar statements by South St. Paul officials.

73. Sanimax is therefore entitled to relief under 42 U.S.C. § 1983, including a declaration that the 2020 Odor Ordinance constitutes unconstitutional retaliation against Sanimax's exercise of its First Amendment rights, an injunction against South St. Paul's enforcement of the 2020 Odor Ordinance Amendment, and damages compensating Sanimax for South St. Paul's retaliation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Sanimax USA, LLC demands judgment in its favor and against the City of South St. Paul, Minnesota, and prays that this Court award it the following relief:

A. A declaration that the South St. Paul City Ordinance No. 1356 is unconstitutionally void for vagueness;

B. An injunction against South St. Paul's enforcement of South St. Paul City Ordinance No. 1356 against Sanimax;

C. An award of compensatory damages in an amount to be determined at trial;

D. An award of Sanimax's costs and expenses in bringing this action;

E. An award of Sanimax's reasonable attorney's fees under 42 U.S.C. § 1988(b); and

F. All such further relief as the Court deems just and proper.

Dated: September 4, 2020.                    Respectfully submitted,


                /s/ Henry M. Helgen, III
                Henry M. Helgen, III (MN No. 151075)
                henry.helgenIII@kutakrock.com
                Leland P. Abide (MN No. 398269)
                leland.abide@kutakrock.com
                KUTAK ROCK LLP
                60 South Sixth Street, Suite 3400
                Minneapolis, MN 55402-4400
                Telephone: (612) 334-5000

                Stephan J. Nickels, MN Bar No. 0304761
                snickels@foley.com
                Andrew C. Gresik (*pro hac vice* application forthcoming)
                agresik@foley.com
                FOLEY & LARDNER LLP
                150 East Gilman Street, Suite 5000
                Madison, WI 53703
                Telephone: (608) 258-4238

                Aaron R. Wegrzyn (*pro hac vice* application forthcoming)
                FOLEY & LARDNER LLP
                777 East Wisconsin Avenue
                Milwaukee, WI 53202
                Telephone: (414) 297-5156

                *Attorneys for Sanimax USA, LLC*